NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

ERIN B., *Appellant,*

*v.*

JON F., T.F., A.F., X.F., *Appellees.*

No. 1 CA-JV 18-0414
FILED 3-19-2019

Appeal from the Superior Court in Maricopa County
No. JS518544
The Honorable Cynthia L. Gialketsis, Judge *Pro Tempore*

**AFFIRMED**

COUNSEL

Vierling Law Offices, Phoenix
By Thomas A. Vierling
*Counsel for Appellant*

Berkshire Law Offices PLLC, Tempe
By Keith Berkshire, Erica L. Gadberry
*Counsel for Appellee Jon F.*

---

**MEMORANDUM DECISION**

Judge Randall M. Howe delivered the decision of the Court, in which Presiding Judge Paul J. McMurdie and Judge Jennifer B. Campbell joined.

---

**H O W E**, Judge:

¶1        Erin B. ("Mother") appeals from the juvenile court's order terminating her parental rights to her children, T.F., A.F., and X.F. For the following reasons, we affirm.

**FACTS AND PROCEDURAL HISTORY**

¶2        Mother and Jon F. ("Father") are the biological parents of T.F., A.F., and X.F. Mother and Father were married in August 1998, and their first child, T.F., was born in April 2002. According to Father, his relationship with Mother became "chaotic" after she gave birth to their twins—A.F. and X.F—and T.F. was diagnosed with autism. Mother and Father separated in early 2009 and then divorced in November 2010.

¶3        In January 2014, Father petitioned the court to modify orders regarding legal decision-making authority, parenting time, child support, and spousal maintenance. In February 2015, Dr. Raymond Branton performed a court-ordered psychological evaluation of Mother and submitted a report to the court. Dr. Branton concluded that Mother had several personality disorders, as well as anxiety and hoarding disorders. He also noted that Mother's "significant mental health issues, unhealthy patterns, and unstable lifestyle may limit [her] ability to properly care for the children." The court entered final orders in May 2015, which became effective in June 2015. The court granted Father sole legal decision-making authority, designated him as the primary residential parent, and allowed Mother supervised visits. The court also set forth requirements for Mother to qualify for unsupervised visits. At a minimum, she had to demonstrate that she was complying with Dr. Branton's recommendations outlined in his report. Those recommendations included engaging in weekly individual counseling "to address the mental health symptoms, [] cognitive distortions, and problematic behavioral patterns" identified in the report and providing "[q]uarterly progress reports from the counselor . . . to the [c]ourt[.]" Mother never sought to modify the court's final orders, including the child support award.

¶4   Despite the parenting time order, Mother did not exercise her right to supervised parenting time and requested only one supervised visit through email in the years that followed. According to Father, Mother also never sent any gifts, photos, or letters, and she failed to satisfy her child support obligations.

¶5   In July 2017, Father petitioned the juvenile court to terminate Mother's parental rights, citing abandonment under A.R.S. § 8–533(B)(1) and mental illness under A.R.S. § 8–533(B)(3) as grounds for termination. As the termination hearing approached, Mother's tax refund was intercepted to pay delinquent child support. She was also found in contempt of court for failure to pay child support arrears that accrued between June 2015 and November 2017.  The court ordered that she not be released until she remitted a purge payment of $5,000. In March 2018, she paid $5,000 to purge the contempt order. According to Father, "that was the first time Mother voluntarily paid any support[.]" He reported that between May 2015 and March 2018, he had only received two child support payments from Mother, which were acquired through "garnishment" or other involuntary means.

¶6   At the contested July 2018 termination hearing, Mother was asked why she had not provided the court with any of the counseling reports that she was ordered to submit to have unsupervised contact with the children. She explained that she had experienced "setbacks" because she had been focusing on an ongoing dependency proceeding the Department of Child Safety had brought regarding a child that was not at issue in the present matter, X.B. Mother then testified that although she did not provide any counseling reports to the court, she had been participating in counseling through TERROS—which she said helped her overcome an "alcohol disorder." She later acknowledged, however, that she had not provided her counselor with Dr. Branton's full psychological evaluation report.

¶7   Father testified about the children's recent interactions with Mother. According to Father, Mother had only one phone conversation with A.F., who was upset by that conversation and refused thereafter to speak to Mother. Father also testified that X.F. was upset after Mother's most recent phone call, during which he learned that Mother had permanently moved to California and had another child.

¶8   Father then testified about matters concerning the best interests of the children. According to Father, he petitioned to terminate Mother's parental rights because he wanted his fiancée—D.W.—to adopt

the children. He asserted that having Mother's parental rights terminated would benefit the children because it would allow D.W. to adopt them and restore stability in their lives. He testified that D.W. performed parental duties for the children and had "been the exact figure that a mother should be[.]" He explained that D.W. had been involved in the children's "everyday life" and that she had actively engaged in helping T.F. with his needs. He specifically mentioned that "[s]he's part of the [Individual Education Programs], the [Individual Support Plans], [and] she works with the therapist[.]"

¶9 D.W. confirmed that she wanted to adopt the children and that she performed parental duties for the children. She also testified that she is committed to helping T.F. with his medical needs and in improving his condition. She testified further that she intends to marry Father "as soon as this [thing] wraps up[.]"

¶10 A caseworker opined in a social study report that termination was in the children's best interests because the children were in a stable home with Father and D.W. who have been providing—and can continue providing—for the children's financial, emotional, and educational needs. According to the report, D.W. felt "pride" in caring for T.F., A.F., and X.F., looked forward to the day she is able to adopt them, and had been helping raise the children for the past two years.

¶11 Furthermore, the report noted that Mother had no contact with T.F. since May 2015 and that she had never inquired about any of the children's well-being. It also noted that the only contact that Mother had with the children was one phone call with X.F. and A.F in November 2015 and one additional phone call with just X.F. in February 2017. Moreover, the report stated that a bond between the children and D.W. "was evident during the study" and that D.W. was actively involved in the care of T.F.

¶12 The juvenile court terminated Mother's parental rights under the statutory ground of abandonment. The court found that Mother had no physical contact with the children since June 2015 and that her last phone contact with any of the children was in February 2017. The court noted that Mother had failed to provide reasonable child support on a regular basis, recently had a tax refund seized to pay for arrears in her child support, and had made little effort to satisfy the requirements to have unsupervised visits with the children. The court further noted that although Mother had gone to counseling, she "never provided a copy of Dr. Branton's report (only providing page 16) to her counselor so that the issues raised by Dr. Branton could be addressed properly."

¶13 The court then found that terminating Mother's parental rights would be in the children's best interests. The court reasoned that termination would benefit the children because it would allow D.W. to adopt them. The court noted that D.W. had assumed a "maternal role" in the children's lives, had been fully engaged in addressing T.F.'s special needs, and had been actively involved in providing for the children's educational needs. Also, the court found that continuing the parent-child relationship would be detrimental to the children because Mother was unable to demonstrate an understanding for why her actions had upset the children. The court also noted that Mother had neither inquired about T.F.'s needs nor participated in his care since 2015. Mother timely appealed.

## DISCUSSION

¶14 Mother challenges only the juvenile court's best interests finding; she does not dispute the finding of abandonment. A juvenile court's termination order is reviewed for an abuse of discretion. *E.R. v. Dep't of Child Safety*, 237 Ariz. 56, 58 ¶ 9 (App. 2015). "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280 ¶ 4 (App. 2002). We accept the juvenile court's factual findings unless no reasonable evidence supports them and will affirm a termination order unless it is clearly erroneous. *Bobby G. v. Ariz. Dep't of Econ. Sec.*, 219 Ariz. 506, 508 ¶ 1 (App. 2008).

¶15 Terminating parental rights is in the children's best interests if the children will benefit from the termination or will be harmed if the relationship continues. *Shawanee S. v. Ariz. Dep't of Econ. Sec.*, 234 Ariz. 174, 179 ¶ 20 (App. 2014). In determining whether the children will benefit from termination, relevant factors include whether the placement is meeting the children's needs, an adoption plan is in place, and if the children are adoptable. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3–4 ¶ 12 (2016). "Of course, a court need not automatically conclude that severance is in a child's best interests just because the child is adoptable; there may be other circumstances indicating that severance is not the best option." *Id.* at 4 ¶ 14. The juvenile court must, therefore, consider the totality of the circumstances when making a best-interests finding. *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 99 ¶ 12 (App. 2016).

¶16 Sufficient evidence supports the juvenile court's finding that the children would both benefit from the termination and would be harmed if the relationship continued. The caseworker that conducted the social

study reported that Father and D.W. had been appropriately providing for the children's needs and that the children had a positive relationship with D.W. Additionally, Father testified that terminating Mother's parental rights would benefit the children because it would restore a stable home environment and allow D.W. to adopt the children. D.W. also expressed her desire to adopt and stated that she had been performing parental duties for the children for two years. In contrast, Mother had not seen the children in several years, had been unable to meet any of the requirements to obtain unsupervised contact with the children, and her only contact with the children had upset them. Thus, the record adequately supports the court's finding that termination was in the children's best interests.

¶17        Mother asserts that termination would not benefit the children because Father and D.W.'s plan to marry was "speculative" and unsupported by "credible evidence." We decline to consider Mother's assertion because we will not substitute our judgment for that of the juvenile court about the credibility and weight of witness testimony. *See Jesus M.*, 203 Ariz. at 282 ¶¶ 4, 12. Moreover, availability of a likely adoptive parent is only one potential benefit relevant to a best-interests assessment, and the record here reflects that additional factors sufficiently support the juvenile court's determination that terminating Mother's parental rights would benefit the children.

¶18        Mother argues that "[D.W.] is not a person who can adopt the children and the Juvenile Court erred as a matter of law in considering her as such." For support, Mother relies on *Audra T. v. Ariz. Dep't of Econ. Sec.*, 194 Ariz. 376 (App. 1998). That decision, however, is inapposite. In *Audra T.*, this Court affirmed the juvenile court's determination that the child's best interests favored placing him with his foster family rather than his paternal grandparents because the grandparents had never established a relationship with the child; the grandmother visited the child only once after his removal, the grandfather had no contact with the child, and the grandparents had not been available to take the child when he was initially removed from his parents. *Id.* at 378 ¶ 7. None of these circumstances are present here. Thus, Mother's argument fails.

¶19        Next, Mother argues that the juvenile court should have considered only her current—and not past—conduct in making its best-interests determination and that the court erred by failing to "articulate how maintaining her parental rights would be a detriment to the children currently or in the future." The record does not support Mother's argument, however. The record shows and the juvenile court found that Mother's patterns of behavior and complete absence from the children's lives had

negatively affected the children and that those same patterns and circumstances persisted at the time of the termination hearing. As of the termination hearing, Mother had virtually no contact with the children for many years; her most recent interaction with X.F. had left him distraught; she had never sent any gifts, letters, or pictures; she had made little or no effort to visit the children; and she had not provided the children with any meaningful financial support. Furthermore, the juvenile court found that Mother had not inquired about T.F.'s needs, had not participated in his care since 2015, and she recently had a tax refund intercepted to pay for arrears in her child support. The court's best-interests determination is therefore based on "current" evidence, and that evidence adequately supports the conclusion that maintaining Mother's parent-child relationship risked harm to the children.

¶20          Mother nonetheless highlights her testimony that she participated in counseling services, has a bond with the children, "overcame alcohol," and "is ready to begin therapeutic intervention for visitation and contact." But in doing so Mother essentially asks this Court to reweigh the evidence presented at trial, which we will not do. *See Jesus M.*, 203 Ariz. at 282 ¶ 12 (stating that this Court does not reweigh evidence on appeal). Thus, the juvenile court did not err in finding that terminating Mother's rights would be in the children's best interests.

**CONCLUSION**

¶21          For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:  AA

7